LOUIS J. KOTLIKOFF, PLAINTIFF-RESPONDENT, v. THE COMMUNITY NEWS, THE SUBURBAN NEWSPAPER GROUP, LOUIS J. RECCHINO, ALBERT MATTERN, JAMES R. RODI AND ROBERT LEATHER, JOINTLY, SEVERALLY OR IN THE ALTERNATIVE, DEFENDANTS-APPELLANTS.

Argued November 16, 1981—Decided April 27, 1982.

*Robert T. Lehman* argued the cause for appellants The Community News, et al., (*Archer, Greiner & Read,* attorneys).

*William H. Buckman* argued the cause for appellant Robert Leather.

*Jeffrey M. Keiser* argued the cause for respondent (*Ballen, Keiser & Denker,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, Justice.

This case addresses an aspect of the constitutional protection accorded expression of opinion about a public figure. Our consideration of the subject comes in the wake of recent Supreme Court decisions dealing with defamation. Plaintiff claims that allegations of a "cover up" contained in defendant Leather's letter to the editor of a local newspaper were defamatory. The trial court, ruling that the remarks were privileged as fair comment, granted defendants' motion for summary judg-

ment. The Appellate Division reversed and remanded. We reverse and reinstate the trial court judgments in favor of defendants.

Although we conclude that under *Gertz v. Welch,* 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.*2d 789 (1974), the common law privilege of fair comment is no longer relevant, we hold that the opinions set forth in defendant's letter are protected by the First Amendment. Inasmuch as the statements contained in the letter were not defamatory, we do not reach the question of whether they were published with the actual malice required to sustain an action for defamation against a public official. See *Lawrence v. Bauer Publishing & Printing,* 89 *N.J.* 451, 467–68 (1982).

I

The Community News is a small, local newspaper published weekly and distributed generally by The Community News, Inc. in Pennsauken, Merchantville, and Delair, New Jersey. In its March 27, 1975 edition the Community News published a "letter to the editor" written by defendant Robert Leather, a resident of Pennsauken, criticizing the official conduct of plaintiff, Louis J. Kotlikoff, then the Mayor of Pennsauken. In the letter, which was published under the heading "A Conspiracy?", Leather suggested that Mayor Kotlikoff and Tax Collector Harold Roesler, who had repeatedly refused to reveal the names of property owners delinquent in their payment of local property taxes, might be "engaged in a huge coverup." The letter expressed concern that the decline in property tax collections would cause an increase in the tax rate, and criticized Kotlikoff and Roesler for withholding from the public and the Township Committee the names of delinquent taxpayers. Leather's letter concluded by stating that the circumstances surrounding Roesler's refusal to make public records available "add[ed] to the belief that there is a conspiracy * * *."

Shortly thereafter Kotlikoff filed this suit alleging that the newspaper's publication of the letter was libelous, defamato-

ry, and damaging to his reputation. He named as defendants The Community News; its publisher, the Suburban Newspaper Group; its general manager, Louis J. Recchino; its executive editor, Albert Mattern; its advertising director, James R. Rodi (hereinafter referred to collectively as the newspaper defendants); and the writer of the allegedly defamatory letter, Robert Leather.[1]

The newspaper defendants filed two motions for summary judgment. In the first motion they claimed that the complaint and affidavits of plaintiff, a public official, had failed to allege sufficient facts to permit the conclusion that the newspaper had published the letter with actual malice. After the court denied that motion, the newspaper defendants filed a second summary judgment motion on the ground that the newspaper's publication of the letter to the editor was not libelous or defamatory as a matter of law. The trial court granted that motion, holding that the letter was not reasonably susceptible of a defamatory interpretation inasmuch as it expressed simply an opinion based upon disclosed facts. Consistent with that determination the trial court thereafter entered summary judgment for Leather.

Plaintiff appealed from the summary judgments against him, and the newspaper defendants cross-appealed the denial of their motion for summary judgment on the issue of actual malice. The Appellate Division reversed the summary judgments in favor of defendants and remanded the matter for further proceedings. It held that the letter could reasonably be interpreted as accusing plaintiff of having committed criminal conspiracy; hence a jury should have decided whether it was in fact defamatory. In a supplemental opinion the Appellate Division held that the trial court had correctly determined that the issue of actual malice involved questions of fact.

---

[1] It is a well settled rule of defamation law that one who republishes libelous matter is subject to liability as if he had published it originally, even though he attributes the libelous statements to the original publisher. For that reason the newspaper defendants stand in essentially the same position as defendant Leather in regard to their potential liability.

We granted the defendants' petitions for certification, 87 *N.J.* 428 (1981), and 88 *N.J.* 500 (1981), and now reverse.

## II

At the heart of every action for libel or defamation is the threshold issue of whether the language used is reasonably susceptible of a defamatory meaning. It is well established that that question is one of law to be resolved by the court. *Herrmann v. Newark Morning Ledger Co.,* 48 *N.J.Super.* 420, 429–30 (App.Div.1958). Likewise, the critical issue in this case—whether the letter in question amounted to a statement of fact or an expression of opinion—is a question of law for the court. *Rinaldi v. Holt, Rinehart & Winston,* 42 *N.Y.*2d 369, 380, 366 *N.E.*2d 1299, 1306, 397 *N.Y.S.*2d 943, 950, *cert.* den., 434 *U.S.* 969, 98 *S.Ct.* 514, 54 *L.Ed.*2d 456 (1977). As a preliminary matter we therefore emphasize that the summary judgment procedure is particularly well suited to this sensitive area of First Amendment Law.

Recent developments in the law of libel and defamation have been directed towards preventing people from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government. See *Washington Post Co. v. Keogh,* 365 *F.*2d 965, 968 (D.C.Cir.1966), *cert.* den., 385 *U.S.* 1011, 87 *S.Ct.* 708, 17 *L.Ed.*2d 548 (1967). The threat of prolonged and expensive litigation has a real potential for chilling journalistic criticism and comment upon public figures and public affairs. Furthermore, the prospect of delay attendant upon *any* defamation trial, no matter how expeditiously handled, may inhibit the full and free exercise of constitutionally-protected activities. See *id.*

The summary judgment device, as employed by the trial court here in the pre-discovery stage, winnows out nonactionable claims, avoids the expenditure of unnecessary legal fees, and discourages frivolous suits. We therefore encourage trial courts to give particularly careful consideration to identifying appro-

priate cases for summary judgment disposition in this area of the law. See *Novack v. City Service Oil Co.*, 149 *N.J.Super.* 542, 550 (Law Div. 1977), aff'd, 159 *N.J.Super.* 400 (App.Div.1978).

### III

Traditionally, one could be found liable for defamation if one published an opinion that harmed another's reputation. However, expressions of opinion were privileged if they constituted "fair comment" on a matter of public concern. *Restatement (Second) of Torts* § 566, comment a (1977). This Court has articulated the following definition of the fair comment privilege:

> In a word, "fair comment" (a) must be based on facts truly stated, and (b) must not contain imputations of corrupt or dishonourable motives on the person whose conduct or work is criticized, save in so far as such imputations are warranted by the facts, and (c) must be the honest expression of the writer's real opinion; and if the comment complies with these conditions, it is fair comment, however incorrect be the views expressed by the critic, or however exaggerated or even prejudiced be the language of the criticism; the "limits of criticism are exceedingly wide." *Gatley, Libel and Slander, sections* 344, 354. [*Leers v. Green*, 24 *N.J.* 239, 254–55 (1957).]

However, with the Supreme Court decisions in *New York Times v. Sullivan*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964), and *Gertz v. Welch*, 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.* 2d 789 (1974), the "fair comment" doctrine became obsolete insofar as its application is confined to a mere expression of opinion. The Court stated in *Gertz*:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. [*Id.* at 339–40, 94 *S.Ct.* at 3006–07, 41 *L.Ed.*2d at 805 (footnote omitted).]

Section 566 of the *Restatement (Second) of Torts* (1977) dwells on the distinction between protected expressions of opinion and unprotected false statements of fact. Comment b to that section indicates that there are two types of expression of opinion. The first, or "pure", kind is found when the maker of the comment states the facts on which he bases his opinion of the

plaintiff and then states a view as to the plaintiff's conduct, qualifications or character. "Pure" expression of opinion occurs also when the maker of the comment does not spell out the alleged facts on which the opinion is based but both parties to the communication know the facts or assume their existence and the statement of opinion is obviously based on those assumed facts as justification for the opinion. The second, or "mixed", type of expression of opinion is one that, while an opinion in form or context, is apparently based on facts about the plaintiff or his conduct that have neither been stated by the defendant nor assumed to exist by the parties to the communication. Section 566 points up the practical application of these principles, distinguishing between unprotected false statements of fact and protected expressions of opinion as follows:

> A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.[2]

The "fair comment" privilege has thus been replaced by a broader protection. Expressions of "pure" opinion on matters of public concern may no longer be the basis of an action for defamation.[3]

---

[2] It might be more accurate to refer to defamatory "falsehoods" rather than defamatory "facts"; for if indeed the "facts" forming the basis of the opinion are (as all "facts" are) true, then despite the defamatory nature of those facts—and whether disclosed or undisclosed—the statement would not be actionable. See *Restatement (Second) of Torts* § 581A, comment c (1977). Note that according to the Restatement a privilege exists for publication of defamatory matter concerning another in a report of an official action or proceeding on a public meeting dealing with a subject of public concern, even when the publisher *knows* the defamatory statement to be false. *Restatement (Second) of Torts* § 611, comment a (1977).

[3] It is unnecessary for us to consider here whether the *Gertz* protection would extend also to opinions on private matters contained in private communications. The American Law Institute takes the position that protection of private opinion is the logical extension of the *Gertz* dictum. *Restatement (Second) of Torts* § 566, comment c (1977). But see Note, *Fact and Opinion after Gertz v. Robert Welch, Inc.: The Evolution of a Privilege*, 34 *Rut.L.Rev.* 81, 97–99, 126 (Fall 1981).

The question, then, is whether the allegedly libelous letter in this case contained false and defamatory statements of fact or whether it simply expressed protected statements of opinion. See *Buckley v. Littell*, 539 *F*.2d 882, 893 (2d Cir. 1976). As indicated heretofore, *supra* at 67, whether a particular publication constitutes a statement of fact or an expression of opinion is a question of law for the court.

In *Greenbelt Cooperative Publ. Ass'n, Inc. v. Bresler*, 398 *U.S.* 6, 90 *S.Ct.* 1537, 26 *L.Ed.*2d 6 (1970), the publishers of a local newspaper published a citizen's statement made at a city council meeting that the plaintiff, a local real estate developer, was "blackmailing" the city in connection with pending negotiations for certain zoning variances. The Supreme Court reversed a state court judgment for the plaintiff and remanded the case for further proceedings. The Court determined that no libel had been committed inasmuch as there had been no false accusation of criminal conduct. Justice Stewart wrote that no reader of the newspaper report of the meeting could possibly have interpreted it to mean that plaintiff was being charged with the crime of blackmail. 398 *U.S.* at 14, 90 *S.Ct.* at 1541, 26 *L.Ed.*2d at 15. Rather, "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [plaintiff's] negotiating position extremely unreasonable." *Id.*

*Rinaldi v. Holt, Rinehart & Winston, supra,* further illustrates the distinction between defamatory statements of fact and nondefamatory expressions of opinions or ideas. In *Rinaldi*, a state supreme court Justice alleged that a book highly critical of his judicial performance had libeled him. In a chapter entitled "The Ten Worst Judges in New York" the book stated that plaintiff was "very tough" on poor and underrepresented Blacks and Hispanics, but "soft" and "easy" on well-connected organized crime figures and large-scale narcotics dealers, especially in matters involving bail, probation and sentencing. After referring to several specific examples in this "disturbing pattern" of plaintiff's record of previous dispositions, the author concluded

that plaintiff was "incompetent," "probably corrupt," and "suspiciously lenient." 42 N.Y.2d at 376, 366 N.E.2d at 1303, 397 N.Y.S.2d at 947.

The New York Court of Appeals reversed a trial court order denying summary judgment for defendant. The court held that the statement that plaintiff was an "incompetent" judge who should be removed from office was a constitutionally-protected expression of opinion relating to his performance while in judicial office. Id. at 380, 366 N.E.2d at 1306, 397 N.Y.S.2d at 950. Since the facts supporting the author's opinion were disclosed, readers were reasonably able to draw their own conclusions as to whether those facts justified that opinion. Id.

However, the court in Rinaldi also held that the charge that the judge was "probably corrupt" and "suspiciously lenient" was not a protected expression of opinion since it implied undisclosed facts. If those factual allegations were false, defendant would be liable for defamation if it had acted with malice. The court explained:

> The ordinary and average reader would likely understand the use of these words, in the context of the entire article, as meaning that plaintiff had committed illegal and unethical actions. Accusations of criminal activity, even in the form of opinion, are not constitutionally protected. * * * While inquiry into motivation is within the scope of absolute privilege, outright charges of illegal conduct, if false, are protected solely by the actual malice test. [42 N.Y.2d at 382, 366 N.E.2d at 1307, 397 N.Y.S.2d at 951 (citations omitted).]

See also Gregory v. McDonnell Douglas Corp., 17 Cal.3d 596, 604, 552 P.2d 425, 433, 131 Cal.Rptr. 641, 646 (Cal.1976). In Rinaldi, however, the court held that the trial court should have granted defendants' motion for summary judgment since plaintiff did not allege facts sufficient to create an issue of actual malice.

These cases establish the principle that pejorative statements of opinion are entitled to constitutional protection no matter how extreme, vituperous, or vigorously expressed they may be. Any statement that may refer to criminal conduct must be examined in context in order to determine whether the reader would be left with the impression that plaintiff was being accused of a crime. Language that could reasonably be

understood as implying specific criminal acts on the basis of undisclosed factual allegations, see n.2, *supra* at 69, does not fall within the *Gertz* protection. See, *e.g., Letter Carriers v. Austin,* 418 *U.S.* 264, 282–87, 94 *S.Ct.* 2770, 2780–83, 41 *L.Ed.*2d 745, 761–63 (1974); *Cianci v. New York Times Publ., Co.,* 639 *F.* 2d 54, 64 (2d Cir. 1980).

■ In this case plaintiff objects to language accusing him of involvement in a "huge coverup" and a "conspiracy" in connection with his refusal to reveal the names of delinquent taxpayers. Viewed in this context these statements are protected expressions of opinion. The terms "conspiracy" and "coverup" were employed here in a "loose, figurative sense" and as "rhetorical hyperbole," much the same as was the word "blackmail" in *Greenbelt, supra,* 398 *U.S.* at 14, 90 *S.Ct.* at 1542, 26 *L.Ed.*2d at 15. See also *Letter Carriers v. Austin, supra,* 418 *U.S.* at 284, 94 *S.Ct.* at 2781, 41 *L.Ed.*2d at 762. When examined in their full context, the offending words appear to have been used *not* as specific accusations of criminal activity, but rather merely as pejorative rhetoric, criticizing plaintiff in an identified, isolated instance of his performance in public office. See *Nat'l Ass'n of Gov't Employees v. Central Broadcasting Co.,* 379 *Mass.* 220, ——, 396 *N.E.*2d 996, 1001–02 (Mass.1979). The newspaper's caption over the letter simply asked: "A Conspiracy?" In the opening sentence the letter speculated: "Are Mayor Louis J. Kotlikoff and Tax Collector Harold Roesler engaged in a huge conspiracy?" Taken as a whole the letter could not reasonably be interpreted as charging the plaintiff with committing a criminal offense. See *Letter Carriers v. Austin, supra,* 418 *U.S.* at 285, 94 *S.Ct.* at 2781, 41 *L.Ed.*2d at 762; *Greenbelt, supra,* 398 *U.S.* at 14, 90 *S.Ct.* at 1542, 26 *L.Ed.*2d at 15.

■ Moreover, it is significant that the facts upon which defendant Leather based his opinion were fully disclosed in the letter, and it would be unreasonable, based on that opinion's context, to conclude that other defamatory facts are implied. Where an opinion is accompanied by its underlying nondefama-

tory factual basis, see n.2, *supra* at 69, a defamation action premised upon that opinion will fail, no matter how unjustified, unreasonable or derogatory the opinion might be. This is so because readers can interpret the factual statements and decide for themselves whether the writer's opinion was justified. See also *Nat'l Ass'n of Gov't Employees, supra,* 379 *Mass.* at ——, 396 *N.E.*2d at 1000–01; *Restatement (Second) of Torts* § 566, comment c (1977).

## IV

In *New York Times v. Sullivan, supra,* the Supreme Court emphasized our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 *U.S.* at 270, 84 *S.Ct.* at 720, 11 *L.Ed.*2d at 701. The pace and structure of the contemporary American scene are such that today, public debate is seldom found in village squares and town meetings. One of its few available outlets is the "letters to the editor" section of our newspapers. Defendant Leather exercised his First Amendment right to express his opinion on a matter of public concern and fully set forth the facts. He did so in one of the last remaining public forums. If letters of this sort were defamatory, newspapers surely would be reluctant to continue publishing strongly worded letters to the editor. We are loathe to discourage that robust and uninhibited commentary on public issues that is part of our national heritage.

## V

The judgment below reversing the trial court's award of summary judgment for the defendants and remanding the matter for further proceedings is:

Reversed. Judgment for defendants.

*For reversal*—Chief Justice WILENTZ, and Justices PASH-MAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For affirmance*—None.