206 N.J. Super. 81 (1985)
501 A.2d 1029
ROBERT L. KARNELL AND WAYNE L. KARNELL, PLAINTIFFS-APPELLANTS,
v.
RITA CAMPBELL, JOHN PENNA, CAROLLEE ROSENBLATT AND EILEEN WOLFSKEHL, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 28, 1985.
Decided December 9, 1985.
*84 Before Judges MORTON I. GREENBERG, LONG and HAVEY.
Robert B. Hendler argued the cause for appellants (Weiner & Hendler, P.A., attorneys; Robert B. Hendler, of Counsel; Albert J. Peasco, Jr., on the brief).
John J. Pribish argued the cause for respondents Campbell, Penna and Rosenblatt (Patrick F. McAndrew, on the brief).
Alexander F. McGimpsey, Jr. argued the cause for respondent Wolfskehl (McGimpsey & Cafferty, attorneys; Alexander F. McGimpsey, Jr. and David Scott Mack, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
On this appeal, plaintiffs Robert L. and Wayne L. Karnell challenge the entry of summary judgment in favor of defendants Rita Campbell, John Penna, Carollee Rosenblatt and Eileen Wolfskehl in connection with the complaint for defamation plaintiffs instituted against them. The complaint alleged that defendants had maliciously written letters containing false and *85 defamatory statements about plaintiffs which injured plaintiffs' business reputations. It sought compensatory and punitive damages and other relief.
All defendants filed a joint answer denying the allegations of the complaint. Thereafter, Campbell, Penna and Rosenblatt filed an amended answer in which they also denied that the letters were written maliciously and raised several separate defenses, including that plaintiffs were public figures and that defendants' statements constituted fair comment, made in good faith, without knowledge of any falsity or disregard for truth. Eventually all defendants moved for summary judgment on the ground that the publications at issue were expressions of "pure opinion." Plaintiffs cross-moved for summary judgment. The trial judge determined that the letters were indeed expressions of "pure opinion" and not actionable and granted defendants' motion, concomitantly denying plaintiffs' motion. This appeal ensued in which plaintiffs claim that the trial judge erred in determining, as a matter of law, that the letters were not actionable.
The letters which form the basis of plaintiffs' claim were published in the P.D. Review, a newspaper serving Piscataway and Dunellen and involve the former New Market school property and a lot adjoining the school property in Piscataway which plaintiffs were developing through their real estate development firm, the Central Leasing Company. The vacant lot was purchased by plaintiffs for $35,000. Plaintiffs' proposal for development of these properties, the price which they paid for the New Market property, and an alleged underappraisal of the vacant lot leading to its being undervalued for sale to the plaintiffs ultimately became the source of heated debate in the community.
In connection with the New Market property, Rosenblatt wrote a letter which was published on December 16, 1982. In it she said that on December 8, 1982 Piscataway had been "raped." She explained that because the town had been "stupid *86 enough" to trust plaintiffs and rezone the New Market site commercial, eliminating the necessity for a variance, it was getting "another strip mall" instead of the quiet business offices residents had been promised. The town had also been "robbed," according to Rosenblatt, because while undeveloped commercial land could sell for $200,000, the price paid for the New Market property, with improvements and structure included, "amounts to theft." She expressed the hope that the town would fight the planned alterations and void the zoning change "obtained by the developer under false pretenses." According to her, if it did not fight, the town would be not a rape victim, but a "cheap prostitute."
In a lengthy letter published the same day, Penna criticized the planning board for approving plaintiffs' plans to pave over grassland and develop the New Market property into another retail shopping area which, according to Penna, would cause traffic jams, air pollution and storm sewer overloads and thus "only serve to congest and not benefit us." He said that the township and the New Market area had been "duped by the clever maneuvering of very shrewd businessmen" who bought the New Market School and adjacent land at a very low price. According to Penna, "[a]llowing the Karnell group [plaintiffs] the right to build retail stores on our grassland only serves to fatten the Karnell bank account (I can see the smiles on their faces) while, once again, the New Market area gets dumped on." Penna said that the mayor and the planning board could not be trusted in matters concerning the New Market site.
Wolfskehl's letter, which appeared the same day as those of Penna and Rosenblatt, criticized the plaintiffs' development plan and the planning board for approving it in spite of public opposition. She said that "Mr. Karnell seems to have no difficulty in getting what he wants," e.g., a variance to build more parking spaces. She also remarked that citizens who oppose the retail store development plan should be informed that "they have not exhausted every means to stop Karnell from carrying out his plan to satisfy his greed." Wolfskehl *87 complained that a planning board clerk had misinformed her that stores were not part of the plaintiffs' proposed project, and questioned whether the board chose to continue the meeting and make their decision late at night, after many of the citizens had left, because they feared there would be a greater turnout if another meeting were held.
Campbell's letter was published in the P.D. Review on February 24, 1983. This letter said in part:
At the Piscataway Township Council meeting of February 1, Robert Karnell, purchaser of a 0.9-acre lot adjacent to the New Market School, portrayed himself as a much put-upon man. He said that he had been slandered and libeled and he attempted to win sympathy by stating that his wife had been hospitalized for a year and that he himself had had a heart attack and had also been hospitalized. He said that he had been unaware of the restrictive clause in the sale ordinance limiting use of the land to parking.

No one an [sic] believe that a developer who has purchased as much land in Middlesex County as Mr. Karnell has could fail to be aware of that restrictive clause. Moreover, he has a lawyer. Indeed, a lawyer was sitting beside him at the meeting.
........
The injured party is not Mr. Karnell but the citizens of the township for it is now known that the parcel was appraised as being zoned R-7.5 for residential use whereas the council had changed it from education-research to commercial four months prior to the appraisal date. Does Mr. Karnell expect us to believe that he was not aware of this grave error in the appraisal of which he got a copy and for which he paid $300? Do you pay $300 for something and not look at it carefully?

The whole matter raises many questions and I have complained to the Middlesex County Prosecutor. At the council meeting of February 15, Mr. Paley, township counsel, said that he did not know how this error had occurred. Perhaps the prosecutor can find out and whether it was, in fact, an error.[1] [emphasis added]
*88 On February 24, 1984 an article in the P.D. Review reported that the county prosecutor was investigating Campbell's charge that after the former New Market school property was rezoned from educational-research to commercial, plaintiffs purchased it at a "`dishonestly' low cost" because its appraisal value had been "deliberately underestimated" at $35,000 for plaintiffs' gain.
We have analysed this record with care and have concluded that the trial judge properly granted summary judgment to defendants. Thus, we affirm.
Those who write or publish material which tends to injure an individual's reputation, may be subject to liability in a libel action if the material is false. Maressa v. New Jersey Monthly, 89 N.J. 176, 190 (1982), cert. den. 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982). The threshold issue in such actions is "whether the language used is reasonably susceptible of a defamatory meaning." Kotlikoff v. The Community News, 89 N.J. 62, 67 (1982).
Whether language is defamatory on its face is a question of law for a court to resolve, Lawrence v. Bauer Pub. & Print Ltd., 89 N.J. 451, 459 (1982), cert. den. 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982). In so doing the judge must evaluate the statement in context, construing it according to the meaning that a reasonable recipient would give it. Molnar v. Star Ledger, 193 N.J. Super. 12, 18 (App.Div. 1984); Cibenko v. Worth Publ., Inc., 510 F. Supp. 761, 764 (D.N.J. 1981). When the language at issue is capable of both a defamatory and a nondefamatory meaning, there exists a question of fact for a jury to decide. Lawrence, supra, 89 N.J. at 459.
In general it can be said that words that subject a person to ridicule, hatred, or contempt or which "clearly `sound to the disreputation' of an individual are defamatory on their face." Id. at 459 (citation omitted); Garven v. Finch, 97 N.J.L. *89 329, 331 (E. & A. 1922). A false criminal accusation falls into this category. See, e.g., Hoagburg v. Harrah's Marina Hotel Casino, 585 F. Supp. 1167 (D.N.J. 1984); Dijkstra v. Westerink, 168 N.J. Super. 128 (App.Div. 1979), certif. den. 81 N.J. 329 (1979). So does a statement which unavoidably implies that a plaintiff stole property, without explicitly accusing him of theft. Murphy v. Johns-Manville Prods. Corp., 45 N.J. Super. 478, 488 (App.Div. 1957), certif. den. 25 N.J. 55 (1957); Jorgensen v. Pennsylvania R. Co., 38 N.J. Super. 317, 343 (App.Div. 1955), certif. den. 20 N.J. 308 (1956). Where criminal allegations are concerned, a court needs to examine a statement in context to determine whether it conveys the impression that a plaintiff is being accused of a crime, Kotlikoff, supra, 89 N.J. at 71.
The question of whether the statement has a defamatory meaning does not even arise, however, unless the statement is an assertion or implication of "fact." Unlike false statements of fact, expressions of opinion, no matter how insulting, are actionable only if they imply the existence of undisclosed defamatory facts on which the opinion was based. While the opinion cannot be false, those undisclosed defamatory facts may be, thus subjecting the publisher of the opinion to liability. The rationale is that while "there is no constitutional value in false statements of fact," opinions, no matter how "pernicious," cannot be false and are therefore constitutionally protected as "ideas." Gertz v. Robert Welch Inc., 418 U.S. 323, 339-340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974). Therefore the court held in Kotlikoff, supra, 89 N.J. at 68-69, that "pure" expressions of opinion on matter of public concern are not actionable.
In Kotlikoff the court defined a "pure" expression of opinion as one which:
... is found when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then states a view as to the plaintiff's conduct, qualifications or character. `Pure' expression of opinion occurs also when the maker of the comment does not spell out the alleged facts on which the opinion is based but both parties to the communication know the facts or assume their *90 existence and the statement of opinion is obviously based on those assumed facts as justification for the opinion. [Ibid.]
The court went on to describe the "mixed" statement as "one that, while an opinion in form or context, is apparently based on facts about plaintiff or his conduct that have neither been stated by the defendant nor assumed to exist by the parties to the communication." Id. at 69.
The court dismissed as "merely pejorative rhetoric" language that plaintiff had characterized as false factual assertions of criminal activity. Id. at 72. Kotlikoff, the mayor of Pennsauken, had brought a defamation action against the writer of a letter to the editor and the local newspaper that published it. The letter suggested that Kotlikoff was engaged in a "huge coverup" or "conspiracy" because he was refusing to disclose the names of delinquent local property taxpayers. Id. at 65. After reading this language in context the court found that, "taken as a whole the letter could not reasonably be interpreted as charging the plaintiff with committing a criminal offense." Id. at 72 (citations omitted). Instead, the statements were "protected expressions of opinion." Ibid. According to the court, the letter writer had fully disclosed the facts upon which he had based his opinion and no other defamatory facts could reasonably be implied. Ibid. Therefore the opinion was not actionable. The court explained:
... Where an opinion is accompanied by its underlying nondefamatory factual basis, ... a defamation action premised upon that opinion will fail, no matter how unjustified, unreasonable or derogatory the opinion might be. This is so because readers can interpret the factual statements and decide for themselves whether the writer's opinion was justified. [Id. at 72-73; citation omitted]
A similar result was reached in Greenbelt Cooperative Publ. Ass'n., v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) where a real estate developer instituted a defamation action against a newspaper which published a report of city council meetings at which he had been criticized. The newspaper fully and accurately reported on the meetings, in which plaintiff's opponents accused him of "blackmailing" the city in negotiations regarding zoning variances. 398 U.S. at 13, 90 S.Ct. at *91 1541. According to plaintiff, use of the word "blackmail" constituted a false criminal accusation. Ibid. The Supreme Court disagreed. It ruled that any reader would understand that the word was "no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating positions extremely unreasonable." Id. at 14, 90 S.Ct. at 1542.
The decision in Rinaldi v. Holt, Rinehart & Winston, Inc., 42 N.Y.2d 369, 366 N.E.2d 1299, 397 N.Y.S.2d 943 (1977), cert. den. 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977), illustrates the difference between nonactionable "pure" opinion and defamatory mixed opinions. In Rinaldi a judge had sued publishers of a book that was highly critical of him. After setting forth examples of the judge's decisions, the book concluded that he was "incompetent," "probably corrupt" and "suspiciously lenient." The court ruled that statements that he was "incompetent," and that he should be removed from office, both of which were based on specific disclosed facts, were constitutionally protected statements of opinion. 366 N.E.2d at 1306, 397 N.Y.S.2d at 950. However, comments that he was "probably corrupt" and "suspiciously lenient" implied the existence of undisclosed "facts" that might be false. These opinions, therefore, were not protected from attack in a defamation suit. Id. at 1307, 397 N.Y.S.2d at 951.
In Lawrence, supra, defendants who invoked the "pure" opinion rule did not prevail. Plaintiffs in that case were leaders of a local taxpayers' association who opposed municipal appropriations for construction of a new firehouse. Id., 89 N.J. at 455. The taxpayers' association circulated petitions in order to put the appropriation issue before the public as a referendum question. A city official informed an editor and a reporter of a local newspaper that there were "irregularities" in some of the signatures on the petitions and that the city prosecutor was investigating the matter. Id. at 455-456. The newspaper published articles reporting that plaintiffs might be charged with criminal forgery and false swearing of their oaths and *92 affidavits as witnesses to the petition signatures. Id. at 456. The court determined that the "unambiguous import of the two articles is to cast doubt on the reputations of plaintiffs" and that the statement that they "may be" charged with crimes "diminishes their standing in the community and is little different from an assertion that plaintiffs have actually been charged with certain crimes." Id. at 459. The articles therefore were "libelous per se, i.e. not susceptible of a nondefamatory interpretation." Id. at 459.
This is the backdrop on which the statements in this case must be evaluated. We begin with plaintiffs' claim that the trial judge was required to allow a jury to resolve the issue of the questioned statements. This is only true if the statements could be read in either a defamatory or nondefamatory way. Lawrence, supra, at 459. Where as here, she found them capable of being read only as nondefamatory she properly resolved the issue summarily.
Next we turn to the substance of plaintiffs' claims and Wolfskehl's letter which, in our view is clearly not actionable. The gist of the letter is that plaintiff Robert Karnell was having no trouble getting what he wanted from the town: approval of his development plan. Wolfskehl did not hint that he was getting his way through dishonest or criminal tactics although she was critical of municipal officials for capitulating to him despite public opposition to the development plan. Indeed, Wolfskehl's criticism of plaintiff was not even particularly vehement. Her reference to his "greed" was merely "pejorative rhetoric," in fact, much milder than the language held not to be actionable in Kotlikoff and Greenbelt.
Neither was Penna's letter actionable although it refers to the township having been "duped" by plaintiffs' "clever maneuvering." The facts underlying these words (plaintiffs' purchase of the New Market property at a low price and their subsequent application to develop it into a retail mall) were laid out in detail in Penna's letter. In essence Penna portrays *93 plaintiffs as clever businessmen who are profiting at the expense of the citizens and smiling as their bank accounts increase. We view this as pure opinion couched in terms of pejorative rhetoric and, like that in Kotlikoff and Greenbelt, not actionable.
Rosenblatt is a slightly more difficult case. While Rosenblatt's letter uses the words "theft" and "rape," any reader would understand that she was not accusing plaintiffs of the crimes of rape or theft any more than the opponents of the developer in Greenbelt were accusing him of "blackmail." The letter also claims that plaintiffs obtained a zoning change under "false pretenses." Plaintiffs say that this cannot be dismissed as an expression of opinion but that it is either a statement charging plaintiff with dishonest conduct or, at least, an opinion based on undisclosed facts. The statement is not so clearly a criminal accusation or an attack on plaintiffs' reputation as to be defamatory per se. The only question is whether Rosenblatt's opinion as to false pretenses belies undisclosed facts on which she accuses plaintiffs of dishonesty. We think that a contextual reading of Rosenblatt's words leads only to the conclusion that her idea of an appropriate commercial use for the New Market school property is different from plaintiffs. Her reference to "another strip mall" as opposed to quiet business offices supports this view. Rosenblatt does not question the viability of the "commercial" zone per se but only the plaintiff's projected use within that zone. We are satisfied that her letter is nothing more than pure opinion and therefore not actionable.
Campbell presents the closest case. Campbell's letter outlined the facts of plaintiffs' purchase of the questioned property. She indicated that Karnell obtained it at a very low price because it had been incorrectly appraised as "residential" although in fact it had been recently rezoned from education-research to commercial. She said that plaintiff himself had paid for the appraisal and received a copy of it. In her letter she *94 avoided explicitly accusing plaintiff of wrongdoing. However, she wrote: "Does Mr. Karnell expect us to believe that he was not aware of this grave error in the appraisal of which he got a copy and for which he paid $300. Do you pay $300 for something and not look at it carefully?" She also expressed dissatisfaction with the township. She reported that she had complained to the county prosecutor in hopes that he might find out whether the appraisal was, in fact, in error. We view this as protected speech. Campbell set forth in detail the facts underpinning her opinion that Karnell was not unaware of the underappraisal of the property and her belief that Karnell's testimony before the Piscataway Township Council was incredible. She also expressed dissatisfaction with the municipal authorities and it is this overall dissatisfaction which led to this statement:
"The whole matter raises many questions. I have complained to the Middlesex County Prosecutor. At the council meeting of February 15, Mr. Paley, township counsel, said that he did not know how this error had occurred. Perhaps the Prosecutor can find out whether it was, in fact, an error."
As we see it Campbell disclosed all of the facts which formed the basis of her opinion thereby obviating plaintiffs' reliance on the nondisclosure principle. In addition Campbell made a statement of true fact when she indicated that she had exercised her right as a citizen to complain to the Prosecutor.[2] Like those of Wolfskehl, Penna and Rosenberg, these statements are not actionable. Thus the trial judge properly granted summary judgment.
No opinion of this sort would be complete without an expression of the deep concern with which we view plaintiffs' action here. The citizens of our state must be free, within reason, to speak out on matters of public concern. So long as they state the facts implicated fairly and express their opinions, even in the most colorful and hyperbolic terms, their speech should be *95 protected by us. Of course, developers such as plaintiffs here are entitled to invoke their legal rights in a court of law to protect their good names. We nevertheless fear that no one will be left to carry the torch of criticism even when defendants like those in this case are vindicated, after they have withstood the financial and emotional rigors of litigation such as this. Indeed it may become too costly for ordinary citizens to exercise the right to free speech which undergirds a democratic society. We are profoundly concerned with the chilling effect that plaintiffs' lawsuit in these rather unremarkable circumstances may have on other citizens who would ordinarily speak out on behalf of what they perceive to be the public good. We thus consider stringent scrutiny of claims such as plaintiffs' to be required. Like the court in Kotlikoff we are extremely "loathe to discourage that robust and uninhibited commentary on public issues that is part of our national heritage." Kotlikoff, 89 N.J. at 73.
Affirmed.
NOTES
[1] A subsequent letter by Campbell which appeared in the P.D. Review of March 1, 1983 was referred to in plaintiffs' argument on appeal and a copy of this letter was included in the appendix to plaintiffs' brief. Because it was not before the trial judge and the argument made here was not there advanced, it is not properly before us. Similarly, reference to answers to interrogatories relied on here for the first time are inappropriate. We therefore grant defendants' motion to strike those portions of plaintiff's brief and appendix.
[2] In fact the County Prosecutor did investigate this case and recommended that the Township secure a new appraisal.